In re PETTIBONE CORPORATION, a Delaware corporation, a/k/a Beardsley & Piper; Johnston & Jennings; Oceco; Pettibone Alabama; Pettibone Mercury; Barko Alabama; Barko Greenville; and f/k/a Magnum Industries; Pettibone Mulliken; Pettibone Georgia; Mercury Manufacturing; Pettibone Minnesota; Pettibone New York; Pettibone Wisconsin; Pettibone Westrac; National Iron Co.; Pettibone Compaction; Sure Seal Division, Debtor.

In re BARKO HYDRAULICS, INC., a Minnesota corporation, Pettibone Michigan Corporation, a Michigan corporation, Pettibone International Sales Corporation, a Delaware corporation, Pettibone Tiffin Corporation, an Ohio corporation, a/k/a and f/k/a Hanson Machinery Company, Pettibone Ohio Corporation, an Ohio corporation, a/k/a and f/k/a Cleveland Frog & Crossing Company, Pettibone Credit Corporation, a Delaware corporation, the Universal Engineering Corporation, an Iowa corporation, Pettibone Texas Corporation, a Texas corporation, Hammermills, Inc., a Missouri corporation dissolved in June, 1984, Debtors.

Bankruptcy Nos. 86 B 1563–86 B 1572.

United States Bankruptcy Court,
N.D. Illinois, E.D.

May 20, 1987.

James A. Chatz, Antonow & Fink, Chicago, Ill., for movant.

## MEMORANDUM OPINION AND ORDER ON ANTONOW & FINK'S MOTION FOR RECONSIDERATION OF OCTOBER 14, 1986 ORDER DISALLOWING CERTAIN ATTORNEY'S FEES

JACK B. SCHMETTERER, Bankruptcy Judge.

Antonow & Fink ("A & F") as counsel for the Official Unsecured Creditors Committee for Pettibone Corporation has moved for reconsideration of this Courts' October 14, 1986 Order. That Order allowed in part and disallowed in part A & F's petition for fees for services rendered as counsel for the creditors committee between May 5, 1986 and July 31, 1986. This Court has core jurisdiction over matters concerning the administration of the estate. 28 U.S.C. § 157(b). For the reasons set forth below, A & F's motion for reconsideration is denied, except that $2,810.00 in fees that are disallowed may be reconsidered after plan confirmation.

### 1. *Background to the October 14, 1986 Order*

On January 31, 1986, Pettibone Corporation ("Pettibone") and the captioned subsidiaries and affiliates filed their petitions for reorganization pursuant to Chapter 11 of the Bankruptcy Code. Since that date, Pettibone and its affiliates have continued their businesses as Debtors-In-Possession.

Thereafter, the United States Trustee appointed various persons to serve on the Unsecured Creditors' Committee for Pettibone ("Committee"). The Committee subsequently authorized the employment of the law firm of Lord, Bissell & Brook ("LB & B") as counsel for the Committee. However, Alan H. Fox, duly appointed Chairman of the Committee, informed counsel that the Committee itself would not advance or guarantee payment of legal fees for services rendered on its behalf.

The secured lenders ("Private Lenders") also originally indicated that they would not agree to fees being paid from the estate to counsel for any Creditors·Commit-

tee because their provisionally allowed secured position has priority over all administrative expenses.[1] An agreement was eventually reached whereby the secured lenders agreed to allow cash collateral to be used to pay a limited amount of fees for counsel for the Committee.

The terms of this agreement were presented at a hearing on April 2, 1986. Private Lenders agreed to payment of up to $20,000 to Counsel for the Committee. Counsel for the Committee represented that they would "not request during the pendency of the case interim compensation beyond the retainer amount" until a plan was confirmed. *Transcript,* April 2, 1986, p. 4. The Court allowed payment of a $10,000 retainer and allowed counsel for the Committee to "apply whenever they want to as often as they want to up to $20,000." *Transcript,* April 2, 1986, p. 16. The actual written order authorizing the employment of LB & B did not mention any fee limit.

On May 30, 1986, the Court entered an Order authorizing LB & B to withdraw appearance of its attorneys herein, and authorizing A & F to substitute its appearances of its attorneys as counsel of record for the Committee, *nunc pro tunc* May 5, 1986. The substitution Order provided that upon award of any interim fees, the $10,000 retainer would be applied first to the legal services performed by attorneys at LB & B and then to the legal services performed by attorneys at A & F.

On August 22, 1986, this Court established procedures concerning compensation and reimbursement of expenses to professionals. By order, a schedule was set forth under which professionals are to apply to this Court for interim compensation under Section 331 of the Bankruptcy Code. In addition, the Court ordered that all applications comply with the guidelines set forth in *In re Continental Illinois Securities Litigation,* 572 F.Supp. 931 (N.D.Ill.1983).

On October 14, 1986, the Court considered the applications for fees filed by LB & B and A & F. LB & B requested $8,212.80 in fees and $104.45 in expenses for the period February 26, 1986 through May 5, 1986. A & F requested $21,043.50 in fees [2] and $461.21 in expenses for the period May 5, 1986 through July 31, 1986. The majority of work reported by A & F was done by Faye B. Feinstein and James A. Chatz.

No objection to either of the applications were made by any of the parties. The Court, however, had several objections. In general terms, the Court took issue with counsel's failure to husband resources. The substantive functions of the Committee in this case include both analysis of the asserted secured position of the first secured Private Lenders [3] and negotiation on behalf of unsecured creditors over a possible plan of reorganization. Less than $900 in time value out of the total of $29,256.30 requested by LB & B and A & F was spent evaluating the position of the secured credi-

---

1. The Private Lenders have claimed and this Court has provisionally found them to have a secured position on all of the assets of the Debtors. They have asserted a secured claim in excess of $90 million. The estimated liquidation value of Debtor's estates is less than $50 million. Debtors have conceded that they are unable to provide adequate protection to the Private Lenders for use of cash collateral.

2. A & F's application showed a total of $23,686.00 in fees. Of that amount, $941.50 was written off as "learning experiences" and unnecessary work incurred solely as a result of substitution of counsel. In addition, A & F reduced Mr. James A. Chatz's hourly fee from $250 to $215 for a total time value reduction of $1701. $23,686.00 less $941.50 less $1701 equals $21,043.50.

3. In A & F's memorandum in support of reconsideration, A & F characterizes the Court's position as a tactical judgment that A & F should have chosen a "direct attack" on the Private Lenders' liens as its main activity. Such characterization is inaccurate. The Court took issue with counsels' failure to show in their application that it had conducted any meaningful analysis and evaluation of the secured creditor's position.

THE COURT:
 [A] great deal of input should come from them during the planning stage. And in the event, as they say, their clients or one of them wants to make an *analysis* of the secured creditors' position, is that not another major effort that they should be engaged in?
*Transcript,* October 14, 1986, p. 12 (emphasis added).

tors.[4] No work was reported by counsel for the Committee during the period applied for that related to developing a plan of reorganization.

Indeed, the Court found upon considering the two applications that LB & B and A & F had performed very little substantive work, and they had devoted significant time to attending in Court to say they had no objections to particular motions.

This Court also found that some time spent by LB & B and A & F reviewing matters was, in its experience, unreasonable. Based on its findings as to necessity and reasonableness of counsels' work, the Court awarded LB & B only $4,000 in fees and $104.45 in expenses. The Court further allowed A & F $10,500 in fees and $461.21 in expenses. All other fees requested were disallowed.

### 2. The Motion for Reconsideration

On October 16, 1986, A & F moved for reconsideration of the interim award to it. It requested opportunity to present evidence from ten witnesses in support of its application, requested the right to supplement its prior application, and again sought the full award earlier requested.

A & F argues that it has performed services at the specific direction and with the approval of its client, the Committee. In addition, A & F claims it was its duty to remain abreast of all actions in this case and to represent the Committee at all hearings where the rights of unsecured creditors may be affected. According to A & F, it was necessary to review every pleading which was filed in the case and appear at virtually every hearing.

The main thrust of A & F's argument is that the Court has mistaken its role. A & F claims the Court is interposing itself between the Committee and its counsel and is determining, without any knowledge of the discussions and consultations which took place between members of the Committee and A & F, that A & F should have omitted some services and instead performed other services—all contrary to the direction of the Committee.

A & F also contends that the $20,000 cap on use of cash collateral for fees should not have been taken into account when determining the necessity and reasonableness of A & F's services. According to A & F, to the extent the Court was influenced by the arbitrary $20,000 cap, its decision was contrary to the principle that fees are not to be determined on the basis of conservation of the estate or economy of administration. A & F argues it and LB & B should have been allowed the amount requested, although in excess of $20,000, with payment deferred until after confirmation of a plan of reorganization.

### 3. Standards for Reconsideration

Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence. *Keene Corp. v. International Fidelity Insurance Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1982) *aff'd*, 736 F.2d 388 (7th Cir.1984). Such motions cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during pendency of the original matter. *Id.*

The first issue presented by A & F's motion for reconsideration is whether the Court should take additional evidence to supplement A & F's application. A & F requests an opportunity to examine ten witnesses. In addition, A & F has submitted several affidavits in support of its motion for reconsideration. An affidavit from Alan H. Fox, Chairman of the Committee attests that A & F acted according to the Committee's directions and that it was the strategic decision of the Committee not to attack the Private Lenders' liens at this time. Alan G. Sweig, attorney for Debtor, states that Attorneys from A & F suggested changes to the indemnification provision of a proposed agreement to retain Dain Bosworth. Jim L. Blanco, attorney for Debtor, attests that attorneys from A & F

---

**4.** The applicants claimed somewhat less than $1,500. However, the Court can locate less than $900 in entries related to review of the Private Lenders' lien ($550 by A & F for review of the proof of claims, and about $350 by LB & B for meeting with the secured creditors regarding their position herein.)

spoke with him regarding the position of the Committee with respect to a Motion filed by CIT Leasing Corporation and that on behalf of the Committee Faye B. Feinstein agreed to the entry of an agreed order among the interested parties. David A. Golin, attorney for Pettibone, states that he conferred with Faye Feinstein concerning a proposed settlement between Universal Engineering Corp. and Minneapolis Electric Steel Castings on a reclamation claim under § 546 of the Code and that he delivered to A & F a copy of the proposed draft order approving the settlement between Universal and Minneapolis. Joseph L. Matz presented an affidavit in which he stated that in his experience counsel to the Committee is duty bound to follow the Committee's chosen tactical approach and that counsel has an obligation to be present at all hearings where the rights of unsecured creditors may be affected.

The facts attested to by these affiants are neither newly discovered evidence, nor facts of which this Court was unaware when it made its original decision. The Court was plainly aware at the original hearing on October 14, 1986 that A & F had been directed not to attack the liens of Private Lenders, and that A & F had worked on the Bosworth, CIT, and reclamation matters. These facts were clearly stated—as they should have been—in A & F's original petition. There was never any doubt that A & F did the work in the areas asserted. The question was the extent, value, necessity and reasonableness of that work.

As the affidavits newly presented by A & F generally set forth uncontradicted assertions accepted by the Court at the first hearing, any further evidentiary hearing to establish these facts would serve no purpose at all. Certainly the ten witnesses sought to be produced in court could have had their testimony presented in affidavit form. The request to devote two days of trial time to hear those persons give oral testimony that was not presented in writing is hard to comprehend. In any case, the standards of reconsideration require that A & F's request to present witnesses be denied because A & F has not demonstrated that any of those witnesses would present newly discovered evidence.

A & F's sole argument in favor of an evidentiary hearing, moreover, is misplaced. It suggests that because no substantive objections had been raised by interested parties with respect to applicant's fee petition, no factual issues arose until Applicant appeared before this Court at the October 14, 1986 hearing. According to A & F, an evidentiary hearing with respect to fee petitions need be held only if there are disputed factual issues. Under A & F's argument, factual issues were not raised until this Court began its "adversarial" questioning and ruled on its own "*sua sponte*" objections as to A & F's use of time and resources which the Court found somewhat inefficient. A & F therefore concludes that the factual issues supposedly first raised by the Court's ruling should be addressed on rehearing.

■ A & F mis-states the issues presented to this Court upon the original fee hearing. Whether services rendered by professionals are actual, necessary and reasonable are factual issues which exist every time any professional presents a fee petition to a bankruptcy court. Such factual issues do not arise only upon objection by interested parties or the Court, but rather arise upon submission of the Application.

■ The burden of proof to show entitlement to fees is, in all fee matters, always on the applicant. *In re Lindberg Products, Inc.*, 50 B.R. 220, 211 (Bankr.N.D.Ill.1985); *In re Harman Supermarket, Inc.*, 44 B.R. 918, 920 (Bankr.W.D.Va.1984); *In re Horn & Hardart Baking Co.*, 30 B.R. 938, 939 (Bankr.E.D.Pa.1983). This burden is not to be taken lightly, especially given that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors or use by debtor. *In re Hotel Associates, Inc.*, 15 B.R. 487, 488 (Bankr.E.D.Pa.1981).

■ Even if no objections are raised to a fee request, the Bankruptcy Court is still not bound to award the fee as prayed. Indeed, this Court has the independent authority and responsibility to determine the

reasonableness of all fee requests, regardless of whether objections are filed. *In re NRG Resources, Inc.*, 64 B.R. 643, 650 (W.D.La.1986); *In re Esar Ventures*, 62 B.R. 204, 205 (Bankr.D.Ha.1986); *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 585 (Bankr.D.Utah 1985); *In re Wilson Foods Corp.*, 36 B.R. 317, 320 (Bankr.W.D. Okla.1984).

The commentators agree. As one stated, "... the court continues to retain the ultimate responsibility for ensuring that the compensation awarded to professional persons falls within the parameters prescribed by section 330." 2 *Collier on Bankruptcy*, Paragraph 328.02 at 328–8 (15th Ed. 1986). Others are more specific: "Even if no party in interest objects ... the court should review the application to make sure the compensation sought has been earned and is reasonable." R.E. Ginsberg, *Bankruptcy*, Paragraph 4501 (1985). "The bankruptcy judge can and must apply his own expertise *sua sponte*, if necessary, in order to be fair to both counsel and creditors because, in the final analysis, either excess generosity or extreme miserliness in allowing fees will reflect in the public perception of the system." Lavien, *Fees as Seen from the Bankruptcy Bench*, 89 Com.L.J. 136, 138 (March 1984).

This Court should not and will not merely rubber-stamp fee petitions. Because objections to fees are presented so rarely in bankruptcy, the Court's role in this regard is critical.

■ The fee application and hearing thereon are the Applicant's opportunities to meet its burden of proof. Careful preparation of its application with supporting affidavits can meet that burden. Applicant has no basis to complain about any "adversarial" questioning by a Court seeking to carry out its responsibilities upon reading the application. Any judgment disallowing certain fees is a finding that applicant has failed to meet its burden of proof as to those fees.

■ As earlier noted, the only three grounds for reconsideration of a judgment disallowing professional compensation are the same as for any judgment: (1) manifest error of fact; (2) manifest error of law; and (3) newly discovered evidence. If an Applicant is not prepared to answer the Court's questions or otherwise meet its burden of proof at the hearing on fees, that does not entitle it to reconsideration afterwards.

■ Bankruptcy Rule 2016 requires that all the necessary information be in the fee application itself. Applicants cannot rely on the fee petition hearing to "explain" the fee petition. Life is too short and the daily court call is too crowded to allow valuable court time for such verbal explanations and testimony thereon. Applicants must put the explanations in writing and may submit accompanying affidavits containing further explanations or details if necessary.

A & F cites *In re Cuisine Magazine, Inc.*, 61 B.R. 210 (Bankr.S.D.N.Y.1986) and *In re Wilson Foods Corp.*, 40 B.R. 118 (Bankr.W.D.Okla.1984) for the proposition that petitions may be supplemented after a hearing. In both those cases, the courts, in their discretion allowed the applicants to supplement, after a hearing but before final decision, their fee petitions in accordance with guidelines set forth by the Court. However, neither of those cases were decided on reconsideration and neither stand for the proposition that applicants may supplement petitions or present evidence *after* the court has ruled on the application. In this case, the Court has already ruled on A & F's application. A & F should not seek to supplement its fee petition after decision thereon.

Indeed, given the heavy flow of work through the bankruptcy courts and the many hundreds of fee petitions passed on by each bankruptcy judge each year (certainly over a thousand in both Chapter 7 and Chapter 11 cases), counsel must be held to the ordinary standards for reconsideration. Otherwise, many fee applications would be heard twice since attorneys would take a second bite at the apple after the fees they seek are reduced. There is no reason why this Court should be subjected to the burden of double fee hearings or being obliged to take evidence on matters

that can be set forth in the application or affidavits, or to hear testimony on matters that counsel did not even see fit to present in writing. Accordingly, the request for evidence hearing is denied and A & F has not presented formal grounds to justify rehearing.

Nonetheless, this Court has in this case considered all affidavits presented and arguments made and has in fact reconsidered the A & F application.

### 4. *Standards for Review of Attorney Fee Petitions*

Under Section 330 of the Bankruptcy Code, professionals applying for fees must demonstrate *in writing* that their services were (1) actual; (2) necessary, and (3) reasonable. Once services have been performed, Bankruptcy Rule 2016 requires that:

> A person seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a *detailed* statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. (Emphasis added.)

These detailed applications establish the "actual," while an accompanying narrative explanation of the "how" and "why" establishes the "necessary."

The primary objective of any fee petition is to reveal sufficient data to enable the Court to determine whether the services rendered were reasonable, actual and necessary. *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557 at 582 (Bankr.D.Utah, 1985). Without accurate detailed time records the court lacks any objective basis for making a fee award. Without specificity, fee proceedings become unduly burdensome to the Court and parties in interest. The record-keeping requirement is thus obviously important and will generally be satisfied if the court can from the Application and accompanying narrative pass on all aspects of services performed.

The following discussion is not fully applicable to issues presented by the A & F Application, but is partly presented to guide A & F and other professionals in the case to the standards to be followed on review of fee applications herein.

### *Form of Application*

Given the requirement for detail to show that services rendered were actual and necessary, all fee applications are evaluated by this Court in accordance with the following guidelines and precedent. The larger the case and fee requested, the more rigorous must be the application of these principles:

■ 1. *Itemized Daily Entries.* A proper fee application must list each activity, its date, the attorney who performed the work, a description of the nature and substance of the work performed, and the time spent on the work. *In re Lindberg Products, Inc.*, 50 B.R. 220, 221–22 (Bankr. N.D.Ill.1985). Records which give no explanation of the activities performed are not compensable. *In re Affinito & Son, Inc.*, 63 B.R. 495, 498 (Bankr.W.D.Pa.1986).

2. *Particular Entries.*

■ *Telephone Calls.* An entry of "telephone call" or even "telephone call with Mrs. X" is insufficient. *In re R & B Institutional Sales, Inc.*, 65 B.R. 876, 881 (Bankr.W.D.Pa.1986); *In re Four Star Terminals*, 42 B.R. 419, 426 (Bankr.D.Alaska 1984). The purpose and length of the conversations, and the person called or calling, must be clearly set out. *In re NRG Resources, Inc.*, 64 B.R. 643, 653 (W.D.La. 1986); *In re DiDiorio & Sons, Inc.*, 46 B.R. 648, 651 (Bankr.N.D.Ill.1985).

■ *Conferences.* Similarly, an entry of "conference" or "meeting," "conference with X" or "conversation with X" is insufficient. The entry should at the very least note the nature and purpose of the various meetings and conferences as well as the parties involved. *In re NRG Resources, Inc.*, 64 B.R. 643 (W.D.La.1986).

■ *Drafting Letters or Documents.* Similar requirements apply here. Time entries for drafting documents should specify the document involved and the matter to which it pertains. *In re Baldwin-United Corp.*, 45 B.R. 381, 382 (Bankr.S.D.Ohio 1984). Time entries for drafting letters

should briefly set forth the nature and substance of each letter and to whom it was sent. *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 583 n. 29 (Bankr.D.Utah 1985).

■ *Legal Research.* Entries of "research," "legal research" or "bankruptcy research" are insufficient. *In re Four Star Terminals, Inc.*, 42 B.R. 419, 435 (Bankr.D.Alaska 1984). The nature and purpose of the legal research should be noted. In addition, the entry should indicate what matter the material sought will be used in.

■ *Other Entries.* Time entries for other activities, such as court appearances, preparation for court appearances, and depositions should also very briefly show the nature and purpose or substance of the activity.

■ 3. *Minimum Time.* The actual time spent on each item should be recorded. Except as noted below, small amounts of time should not be uniformly reported as a minimum block of time. *In re Four Star Terminals, Inc.*, 42 B.R. 419, 426–27 n. 1 (Bankr.D.Alaska 1984). For example, the reception of any communication should not be routinely recorded as taking a minimum of one-fifth (0.2) of an hour. *In re Sapolin Paints, Inc.*, 38 B.R. 807, 814 (Bankr.E.D. N.Y.1984). Also, short telephone conversations should not routinely be recorded as .25 or .2 hours. *Four-Star Terminals*, 42 B.R. at 426–27 n. 1. *See also In re Tom Carter Enterprises, Inc.*, 55 B.R. 548, 549 (Bankr.C.D.Cal.1985). The telephone company's rates are predicated upon the premise that most telephone calls terminate within three minutes. *Sapolin*, 38 B.R. at 814. If very short phone calls are routinely recorded as taking 12 or 15 minutes at rates ranging from $110 to $150 per hour and the attorney makes a number of calls, the distortion in the hours claimed and the cost to the estate are substantial. It would not be objectionable to use one-tenth of an hour as the minimum charge for a telephone call or other services, and that minimum is in common use. However, if telephone calls comprise a large portion of the total fee petition, time entries of .1 hour

might also be subject to discount. *See Sapolin*, 38 B.R. at 814.

■ 4. *"Lumping."* Applicants may not circumvent the minimum time requirement or any of the requirements of detail by "lumping" a bunch of activities into a single entry. *In re Horn & Hardart Baking Co.*, 30 B.R. 938, 944 (Bankr.E.D.Pa. 1983). Each type of service should be listed with the corresponding specific time allotment. *In re NRG Resources, Inc.*, 64 B.R. 643, 654 (W.D.La.1986). Otherwise the Court would be unable to determine whether or not the time spent on a specific task was reasonable. *In re Affinito & Son, Inc.*, 63 B.R. 495, 498 (Bankr.W.D.Pa. 1986); *In re Holthoff*, 55 B.R. 36, 42 (Bankr.E.D.Ark.1985). Therefore, services which have been lumped together should not be compensated. *Horn & Hardart*, 30 B.R. at 944.

5. *Abbreviations.* If abbreviations are used in the itemized daily entries, they must be explained somewhere in the application. Unexplained abbreviations will render the time entry noncompensable. *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 582 (Bankr.D.Utah 1985).

The requirement that attorneys and other professionals adequately explain time entries for which compensation is sought is not an overly burdensome task, especially in light of the fact that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors or return to debtor. *In re Hotel Associates, Inc.*, 15 B.R. 487, 488 (Bankr.E. D.Pa.1981). Further, the Court should not be required to indulge in guesswork, nor undertake extensive labor to justify a fee for an applicant who has not itself done so. It is not unreasonable to require an attorney seeking compensation to enlighten the Court about the nature of his toil and the relation it bears to the case. In this District, such requirements have long been standard. *See, e.g., In re Continental Illinois Securities Litigation*, 572 F.Supp. 931 (N.D.Ill.1983). Absent such a statement, compensation may not be allowed. *In re*

*Horn & Hardart Baking Co.,* 30 B.R. 938, 944 (Bankr.E.D.Pa.1983).

### Billing Judgment

■■■ The United States Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a nonbankruptcy matter, stated that attorneys applying to a court for statutory attorney's fees

> should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary; just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here."

*Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40 *quoting Copeland v. Marshall,* 205 U.S. App.D.C. 390, 401, 641 F.2d 880, 891 (1980) (en banc). The standard of Bankruptcy Code § 330 that compensation be for actual and *necessary* services makes the exercise of such "billing judgment" a mandatory requirement in bankruptcy fee matters. A debtor's estate should not bear the burden of a duplication of services, and such duplication should be avoided by counsel on their own initiative by exercise of good "billing judgment." If found in the record, duplication shall be disallowed by the court as unnecessary. *In re Liberal Market, Inc.,* 24 B.R. 653, 664 (Bankr.S.D.Ohio 1982). The following are illustrative examples of the appropriate exercise of "billing judgment" in bankruptcy cases.

■■■ 1. *Individual Responsibility.* Generally, attorneys should work independently, without the incessant "conferring" that so often forms a major part of many fee petitions. While some intraoffice conferences may be necessary, no more than one attorney may charge for it unless an explanation of each attorney's participation is given. *In re R & B Institutional Sales, Inc.,* 65 B.R. 876, 882 (Bankr.W.D.Pa.1986). Examples of the kind of work for which only one attorney will be compensated are:

*Court appearances.* When more than one attorney appears in court on a motion or argument or for a conference, no fee should be sought for non-participating counsel. *In re Jensen-Farley Pictures, Inc.,* 47 B.R. 557, 583 (Bankr.D.Utah 1985). Attorneys should not circumvent this requirement by merely rotating or taking turns participating at a single court appearance. *In re Holthoff,* 55 B.R. 36, 40 (Bankr.E.D.Ark.1985).

*Depositions.* Absent special circumstances, one attorney is sufficient to handle any depositions. *In re Continental Illinois Securities Litigation,* 572 F.Supp. 931, 933 (N.D.Ill.1983).

■■■ 2. *Appropriate Level of Skill.* Senior partner rates will be paid only for work that warrants the attention of a senior partner. A senior partner who spends time reviewing documents or doing research a beginning associate could do will be paid at the rate of a beginning associate. *See In re Continental Illinois Securities Litigation,* 572 F.Supp. 931, 933 (N.D.Ill. 1983). Similarly, non-legal work performed by a lawyer which could have been performed by less costly non-legal employees should command a lesser rate. *Jensen-Farley,* 47 B.R. at 583. The Bankruptcy Code encourages the use of paralegals by law firms. 11 U.S.C. § 330(a)(1); *In re Liberal Market, Inc.,* 24 B.R. 653, 658 (Bankr.S.D.Ohio 1982).

■■■ 3. *Legal Research.* Counsel who are sufficiently experienced to appear before this Court are presumed to have an adequate background in the applicable law. While it is recognized that particular questions requiring research will arise from time to time, no fees will be allowed for general research on law which is well known to practitioners in the area of law involved. *Continental,* 572 F.Supp. at 933.

■■■ 4. *Document Review.* Fees are not allowable for simply reading the work product of another lawyer as a matter of interest. *Id.* Only if such review is required to form some kind of response or to perform a particular task in the case will document review be compensable.

■■■ 5. *Routine Services.* Some courts have held that "routine and ministe-

rial services," that is, telephone calls and correspondence, should be compensated at a lower rate than "truly legal services," such as litigation, research and document drafting. *See e.g. In re Ferkauf, Inc.*, 42 B.R. 852, 858 (Bankr.S.D.N.Y.1984). In this Court's view, this is an unwarranted distinction which is contrary to the fundamental notion that counsel should be encouraged to resolve matters informally whenever possible in order to avoid costly litigation. *See Jensen-Farley*, 47 B.R. at 584.

■ 6. *Fee Petition Preparation.* Most nonbankruptcy attorneys do not charge their clients for the time spent preparing the client's bill for the simple reason that such a task is not performed on behalf of the client. Several Bankruptcy Courts have held that fee petition preparation time is not compensable for that very reason. *See, e.g., In re Wilson Foods Corp.*, 36 B.R. 317, 323 (Bankr.W.D.Okla.1984). This Court feels that the better view is to permit professionals reasonable compensation for time spent in preparing fee applications. *See, e.g., In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 583 (Bankr.D.Utah 1985). If compensation for preparation of fee applications were disallowed, professionals would have little incentive to engage in a comprehensive review of the time expended and the value thereof. Moreover, debtors would be deprived of any discount which might flow from a close scrutiny of the time performed. *See In re NuCorp Energy, Inc.*, 764 F.2d 655, 658–59 (9th Cir. 1985); *In re Vlachos*, 61 B.R. 473, 481 (Bankr.S.D.Ohio 1986).

However, all good things must have some reasonable limits. Some counsel before this Court frequently demonstrate poor time keeping, failure to collate time by subject matter as the work progresses, an opening Application that informs the Court of very little, then a major effort when ordered to comply with the *Continental* case format. This results in fee applications charging ten to fifteen percent of the total requested just for the work to prepare the application. Disproportionate applications will not be allowed nor will fees be allowed for non-informative applications or repeated revisions and supplements of applications that should have been done right originally. In the absence of unusual circumstances, the hours allowed by this Court for preparing and litigating the attorney fee application should not exceed three percent of the total hours in the main case. Such limitation is necessary to insure that the compensation from the attorney fee case will not be disproportionate to the main case. *See Coulter v. State of Tennessee*, 805 F.2d 146, 151 (6th Cir.1986) (in nonbankruptcy case, compensation for preparation and litigation of fee petition limited to 3–5% of hours of main case). Counsel practicing commercial law outside of bankruptcy must explain their bills to their clients. They keep time collated by different projects as they go along, so that their bill preparation can be efficient. Bankruptcy counsel should do no less. Counsel should keep their time records so that fee applications can be prepared and narrated both quickly and efficiently. The *Continental* case *supra* was decided in 1983. By now counsel in this District should impose the internal planning and discipline necessary to keep time properly and prepare fee petitions efficiently.

Finally, in order to clearly indicate that appropriate billing judgment has been exercised, the Court suggests that all time expended on matters before the court be set forth in the application but that time not included in the fee calculation (i.e. "written off") be specially designated and explained. *In re Baldwin-United Corp.*, 45 B.R. 381, 382 (Bankr.S.D.Ohio 1984).

*Organization of Application*

All of the foregoing rules are unenforceable unless there is some means of record keeping that will demonstrate compliance. Accordingly, the time records should be kept and reported chronologically by activity or project rather than by attorney. *See In re Continental Illinois Securities Litigation*, 572 F.Supp. 931, 934–35 (N.D.Ill. 1983). Keeping time by activity or project is the best way for an attorney or law firm to document the worth of their services. In the private practice of commercial law,

clients won't pay bills that do not separate out separate tasks. Their lawyers keep time by separate accounts, and so can bankruptcy attorneys.

■ In addition, as an aid to the Court, professionals seeking compensation here are required to comply with *Continental.* They must submit a narrative summarizing the nature and purpose of each particular activity or project, and the approximate number of hours and compensation sought for each activity. That narrative should also contain a list of each attorney or paralegal that worked on the activity as well as the hours each individual worked on that activity. The narrative should also contain a statement explaining the significance of each activity or project of professional service for which compensation is sought, as well as an explanation of the purpose, necessity and appropriateness of each such service; a statement of the effectiveness of each activity, a statement of what alternatives were considered by the attorney together with the method of analysis relied upon for choosing the action taken; a statement of any difficult or unusual problems which arose in the case and the manner in which they were addressed. *In re Shades of Beauty, Inc.,* 56 B.R. 946, 950 (Bankr.E.D.N.Y.1986); *In re Jensen-Farley Pictures, Inc.,* 47 B.R. 557, 581 (Bankr. D.Utah 1985). Further, the narrative for the time records should include a summary of the normal hourly billing rates of each professional and para-professional and the total hours for each. *Jensen-Farley,* 47 B.R. at 581.

Those statements are no more than any client would need to evaluate his bill. If the Bankruptcy Court is to accept the "lodestar" concept of billable hours times billable rates—as is generally accepted in this community—along with use of the "billable rates" comes responsibility to give a plain and precise explanation to the court as one must to a client who pays the bill.

### The Extent or Value of Compensation

Section 330(a) provides that the court may award

*reasonable* compensation for actual, necessary services … based on the nature, the extent, and the value of such services, the time spent on such services and the cost of comparable services other than in a case under this title.

The requirement that compensation be reasonable raises two questions:

(1) Is the requested hourly rate reasonable?

(2) Are the number of hours expended on each activity reasonable?

Given this statutory scheme, the "lodestar" approach—multiplying the number of actual and necessary hours *reasonably* expended by a reasonable hourly rate—is the appropriate method of determining the extent and value of compensation. *In re D. Diorio & Sons, Inc.,* 46 B.R. 648, 650 (Bankr.N. D.Ill.1985) (court adopts lodestar as starting point only). However, other factors may be considered where appropriate. *Hensley v. Eckerhart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983) was a nonbankruptcy matter concerning statutory attorney's fees. The Supreme Court instructed courts to start with lodestar approach and then, where appropriate, to apply other factors to increase or decrease the initial estimate.

Several Bankruptcy and other courts have listed the "other factors" to be considered as the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson,* 488 F.2d at 717–19. These factors derive

from the ABA Code of Professional Responsibility, DR 2–106.

The Bankruptcy Judge should be familiar with fees charged in the legal profession, and experienced at evaluating the quality of legal work and the difficulty and complexity of legal issues as well as the appropriate amount of time billed for various legal tasks. *See In re Liberal Market, Inc.*, 24 B.R. 653, 657 (Bankr.S.D.Ohio 1982). The Court may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment as to value. *In re WHET, Inc.*, 61 B.R. 709, 713 (Bankr.D. Mass.1986).

A series of judicial decisions under the former Bankruptcy Act held that the compensation of attorneys in bankruptcy proceedings was subject to the overriding concern, unique to bankruptcy cases, of preserving the estate. The effect of the later amendment to Section 330(a), that compensation be commensurate with that awarded in nonbankruptcy matters, was to overrule those cases. That is, economy of administration was eliminated as a standard. *In re NuCorp Energy, Inc.*, 764 F.2d 655 (9th Cir.1985). Under the present Code, compensation must be sufficient in amount to induce competent counsel to undertake bankruptcy matters. However, despite the change made by § 330(a), the services rendered must still be actual and necessary. *In re Shades of Beauty, Inc.*, 56 B.R. 946, 951 (Bankr.E.D.N.Y.1986). Though economy of estate is no longer a standard, it does not follow that the legal engine may always operate at full throttle.

### Hours Reasonably Expended

The Court will determine what is the reasonable amount of time an attorney should have to spend on a given project. *Shades of Beauty*, 56 B.R. at 951. Without such a determination, for example, a slow attorney could earn more than the skillful, efficient practitioner solely due to the additional time he or she needs to obtain the same result. *Id.* An attorney should not be rewarded for inefficiency.

Similarly, attorneys will not be fully compensated for spending an unreasonable number of hours on activities of little benefit to the estate. For example, in *In re WHET, Inc.*, 62 B.R. 770 (Bankr.D.Mass. 1986) an attorney sought $9,568 in fees for services rendered to collect $3,413.75 in accounts receivable. The court reduced the fee to 25 percent of the amount collected because of the limited benefit to the estate from the results achieved. *Id.* at 778.

To sum up, those attorneys and other professionals who competently perform necessary professional services and adequately demonstrate this to the Court will then be awarded appropriate compensation.

### 5. *Findings on Reconsideration*

Although A & F did not demonstrate any grounds for reconsideration, because of this Court's concern at the deeply felt views expressed by counsel, we have fully reanalyzed the A & F petition and have considered all matters set forth by it through affidavits.

### A. *Inadequate Showing as to Services.*

In reevaluating A & F's fee petition, the Court had to retrace A & F's task of appropriately categorizing the services rendered. That is, the Court with aid of its law clerk reviewed the computer print-out line-by-line and allocated the entries to the appropriate narrative category. In so doing the Court ran into several difficulties because of the format of A & F's petition.

A & F's petition consists of a narration of the services rendered and a computer print-out itemizing the individual daily entries. The narrative is separated into eighteen different categories. The computer print-out consists of a single category "Creditors Committee," which merely lists chronologically every activity performed by A & F on behalf of the Committee. A & F gave no clue as to how it allocated the individual computer entries to the narrative categories.

In addition, the majority of the individual entries are inadequate. For example, many entries have activities from several different narrative categories lumped

together. As a consequence, the Court is unable to determine the reasonableness of the time spent on the different activities. Services which have been lumped together should not be compensated. *In re Horn & Hardart Baking Co.*, 30 B.R. 938, 944 (Bankr.E.D.Pa.1983). To adjust for this lumping, the Court was forced to find some way to apportion the actual time spent among the various work projects.

To make matters worse, there are many entries which do not adequately explain the work performed. For example, to document telephone calls, A & F several times merely entered "Telephone call with _____" without explaining the subjects discussed. There are also several entries of "Conference with _____" which do not explain the purpose or subject matter of the conferences. In addition, there are other entries such as "revise memo" which were also inadequate. Records which give no explanation of the activities performed are not compensable. *In re NRG Resources, Inc.*, 64 B.R. 643, 653 (W.D.La.1986); *In re Affinito & Son, Inc.*, 63 B.R. 495, 498 (Bankr. W.D.Pa.1986).

Due to A & F's failure to explain its process of allocation and due to the inadequate documentation, there are discrepancies found by the Court between the total number of hours substantiated for six of the work categories narrated by A & F and the hours claimed by A & F. These discrepancies are set forth in the following table.[5]

| Column 1 Narrative Category | Column 2 Amount Claimed By A&F | Column 3 Amount Substantiated By Time Sheets | Difference (Column 2 less Column 3) |
|---|---|---|---|
| a | $3,657.50 | $3,377.00 | $ 280.50 |
| b | $1,751.00 | $1,411.00 | $ 340.00 |
| d | $1,277.50 | $ 826.00 | $ 451.50 |
| g | $1,758.50 | $1,242.50 | $ 516.00 |
| l | $1,172.50 | $ 560.50 | $ 612.00 |
| p | $1,960.00 | $1,526.50 | $ 433.50 |

TOTAL DISCREPANCY DUE TO INADEQUATE DOCUMENTATION AND EXPLANATION [6] $2,633.50

5. Discrepancies of less than two hours are ignored.

A & F therefore did not meet its burden to document and show that the $2,633.50 in work narrated was either necessary or reasonable, or indeed to demonstrate by time entries that it was performed. Those amounts are therefore not compensable.

### B. *Unnecessary Duplication*

A debtor's estate should not bear the burden of a duplication of services. If found in the record, such duplication shall be disallowed by the court as unnecessary. *In re Liberal Market, Inc.*, 24 B.R. 653, 664 (Bankr.S.D.Ohio 1982). When more than one attorney appears in court on a motion or argument or for a conference, no fee should be sought for non-participating counsel. *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 583 (Bankr.D.Utah 1985).

In this case, there was a great deal of duplication of efforts by A & F attorneys. On May 19, 1986, both Mr. Chatz and Ms. Feinstein charge for preparing for a meeting and then attending the same meeting with creditors and their counsel. The same occurred on July 7, 1986. On June 2, 1986, both Norman B. Newman and Mr. Chatz charge for attending the same court hearing. On June 10, 1986, Mr. Newman and Ms. Feinstein both charge for attending the same court hearing. On June 16 and June 25, 1986, both Ms. Feinstein and Mr. Chatz charge for review of the same matter. On June 20, 1986, Mr. Chatz and Ms. Feinstein both charge for attending the same court hearing. Finally, on June 24, 1986, Mr. Chatz and Mr. Newman both charge for a meeting with "possible investors."

A & F has not demonstrated that participation by more than one counsel was necessary in any of these matters. The entries related to those matters were lumped together with other activities so it is difficult to determine the exact time value of this duplication of efforts. The Court's best understanding is that a deduction of $2,000 for work duplication is required.

6. There were also discrepancies in narrative category (r), but those were not taken into account here, as that entire category is discussed below.

C. *Review of Documents and Court Appearances*

In the August 22, 1986 Order, this Court directed counsels' attention to *In re Continental Illinois Securities Litigation*, 572 F.Supp. 931 (N.D.Ill.1983). Among other things, *Continental* stands for the proposition that review of documents or pleadings will be compensable only if such review is required to form some kind of response or to perform a particular task in the case. *Id.* at 933.

In narrated work categories b, c, d, e, i, j, k, l, m, n, o, p, and r, A & F requests a total of $16,300 for review of the documents, pleadings and orders in this case and for appearing in court on the particular matters mentioned in each respective category. [Category (r) does not specify which matters were reviewed or what motions in court A & F attended.] A & F has affirmatively demonstrated that such review and court attendance were necessary to perform particular tasks in this case in the following categories: c) Debtor's application to sell Canadian subsidiary; e) review of various reclamation complaints; k) review of Debtor's motion to retain Dain Bosworth, Inc.; l) review of proof of claim filed by the secured lenders; m) review of motion filed by CIT Group/Equipment Financing, Inc.; and p) review of Debtor's motion regarding the continued engagement of Recovery Management Corp., Metter-Mark & Assoc., and James B. Corrigan. A & F has not specified for what particular tasks the review in the remaining categories—b, d, i, j, n, o, and r, which represent a total time value of $10,161.50—was necessary.

(i) *The Definition of "Necessary"*

Legal services necessary under Section 330 of the Code are those rendered to the Official Committee in connection with the Committee's duties under Section 1103. However, A & F argues that all of the work it performed, including the extensive review of documents and appearing in court, was by definition "necessary" because the work was done at its client's request and necessity may not be questioned by the Court.

Sections 327 through 331 of the Bankruptcy Code, Title 11 U.S.C. explicitly provide for the court's active role throughout the employment and compensation process. At the outset, pursuant to Section 327(a), (d) and (e), the court must approve the employment of professional persons by the trustee or debtor-in-possession. Section 328 also indicates that the relationship between a creditors committee and its counsel is not sacrosanct. Under Section 328, a committee may with court approval employ a professional person on any reasonable terms and conditions of employment. However, section 328 also provides that "[n]otwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." Moreover, section 329(b) authorizes the court to order the cancellation of an employment agreement, or order the return of any payment which "exceeds the reasonable value of any ... services." Such determination can be made on the court's own initiative. Bankruptcy Rule 2017.

Finally, the very fact that court review of fee applications is required by Section 330 indicates that it is the court that must determine necessity. If necessity were defined by the committee client, the requirements of Section 330 would be meaningless. Review by the court would then entail mere reading of an affidavit by the client that all work was done at its request. Such a result would defeat the purpose of court review under Section 330. The statutory scheme thus demonstrates that the Court must review after the fact all services for which compensation to professionals is sought. It is the court, not the client, that ultimately determines the necessity of particular work based upon hindsight and the court's experience, observations and expertise. *In re Liberal Market Inc.*, 24 B.R. 653 (Bankr.S.D.Ohio 1982).

■ Services of counsel for a creditors committee are necessary if they are in furtherance of the committee's statutory functions under the Bankruptcy Code. Pursuant to Bankruptcy Code Section 1103(c), those functions may include:

(1) consulting with the debtor in possession concerning the administration of the case;

(2) investigating the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(3) participating in the formulation of a plan, advising those represented by such committee of such committee's determinations as to any plan formulated, and collecting and filing with the court acceptances or rejections of a plan; and

(4) performing such other services as are in the interest of those represented.

Participating in formulation of a plan and advising those it represents of the committee's determinations with respect to any plan formulated are among the most important functions of a creditors committee and its counsel. H.Rept. No. 95–595, H.R. 8200, 95th Cong., 1st Sess. (1977) p. 402, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6357.

(ii) *Necessary Tasks in this Case*

The following services in work categories narrated by A & F were necessary to the Committee's functions, except to the extent that such categories have been reduced hereinabove for unnecessary duplication:

b) Review of pleadings regarding motions to modify the automatic stay and review of draft orders disposing of those motions;

d) Review of Debtor's application to engage Heller Financial and conferring with Debtor's counsel regarding the Heller proposal;

i) Attending cash collateral hearings and conferring with counsel for Debtor and the Private Lenders regarding present and future use of cash collateral;

j) Review of Debtor's motion to sell the OCECO product line;

n) Review of General Electric Credit Corporation's motion and conferring with counsel for Debtor and GECC thereon; and

o) Review of Debtor's pleadings involving real estate matters and conferring with Debtor's counsel thereon.

Category (r) requires special discussion. In category (r), A & F requests $5,196.50 in fees for the following: Reviewing motions, applications, "etc." which A & F, as counsel for the Committee, did not take a position on or object to; appearing at hearings on those motions; drafting status memos following such hearings; and organizing the numerous documents and pleadings filed in this case. A good portion of the daily entries for this category (r) in the computer printout consists of entries such as "review various other Pleadings and Motions and Memoranda" or "review of all matters" or "review of pleadings which came in today" or some similar description.

Those entries are inadequate to demonstrate that such review was necessary to perform a function of the Committee. Although the committee's functions are fairly broad and important, Section 1103 does not turn the Committee into some sort of "Grand Overseer" over every Chapter 11 case. Its functions are intimately tied to its Committee members economic interests. Services performed on behalf of the Committee should be those in attempted furtherance of such economic interests. It is by no means clear or demonstrated that all pleadings reviewed and responded to by the Committee's counsel in court effected the economic interests of unsecured creditors. For Committee's counsel to demonstrate that review of pleadings is necessary under Section 330, it must at the very least state what subject matter the pleadings concerned that commanded its attention and presence in court. A & F has failed to do so for a good portion of the entries in category (r).

In addition, A & F charges in category (r) for filing and organizing documents. Professionals will not be compensated for such

ministerial tasks, especially given the high hourly rate of compensation requested here. *See, e.g., In re Holthoff,* 55 B.R. 36, 42 (Bankr.E.D.Ark.1985). Therefore, for the above stated reasons, half of the amount requested for category (r), or $2,600 is disallowed.

### 6. *Reasonable Hours Spent*

The Court must determine what is the reasonable amount of time an attorney should have to spend on a given project. *In re Shades of Beauty, Inc.,* 56 B.R. 946, 951 (Bankr.E.D.N.Y.1986). This Court reads all motions presented prior to their presentment in open court. Upon reviewing time entries presented on this fee application, the Court found that A & F spent more time reading and reviewing many pleadings than the Court did with the same papers when they were presented. For that reason, an additional $500 is disallowed, based on the amount of time value charged for review and the Court's experience of the appropriate time necessary for that review of the motion papers in question.

### 7. *Reasonableness in the Context of Interim Compensation*

 The concept of the reasonable value of professional services applies to requests for interim compensation. Professionals may apply for interim compensation under Title 11 U.S.C. § 331. Section 331 does not require, however, that the Court shall grant the full amount of the interim fee, even if the services were actual and necessary. *In re Coconut Grove Bayshore, Inc.,* 33 B.R. 194 (Bankr.S.D.Fla. 1983). It is often difficult to determine the value of an attorney's services, especially in a Chapter 11 proceeding, at least until a determination has been made as to whether a plan can be confirmed. It is only at the

conclusion of the case that a determination of the full value of the services performed by the professional can be made, because only then is a thorough analysis by the court of the various relevant factors set forth in Section 330 possible. *In re Four Star Terminals, Inc.,* 42 B.R. 419, 438 (Bankr.D.Alaska 1984). Therefore, interim allowances are always subject to the court's re-examination and adjustment during the course of the case, and all expenses of administration must receive the Court's final scrutiny and approval. *In re Callister,* 673 F.2d 305, 306–07 (10th Cir.1982).[7]

This Court originally found that to some extent the applications of A & F and LB & B were unreasonable given the existing circumstances and status of the estate. That is, although counsel's services may have been related to duties of the Committee, those services reported in the instant Application were of little benefit to the creditors, to the Committee, or to the estate. The major tasks of Committee counsel had barely been started when the instant application was filed.

The practice of LB & B and A & F of coming to Court merely to observe on a number of occasions [8] was certainly significant in the light of the current $20,000 cap on moneys available to fund Committee counsel. This $20,000 cap was clearly set forth as a major concern of the Court at the time counsel's appointment was approved. A & F argues that any consideration of the $20,000 cap is an improper consideration of the factor of economy of administration. A & F misconstrues the Court's concern. The Court is not concerned with the conservation of the estate but rather with the effect the cap has on the ability of A & F to perform its function

---

7. In cases in which present existing circumstances do not or cannot warrant a finding of reasonable value, courts commonly hold back a percentage of the interim fee. *In re Georgia Steel, Inc.,* 19 B.R. 834 (Bankr.M.D.Ga.1982).

8. A & F argues that it was not merely observing, but has an obligation to appear at all hearings "where the court may seek comments regarding the committee's position." Its support for this proposition is that the Court at several hearings asked A & F what the position of the Committee

was on certain motions. First, the most common response was that the Committee had no position or no objection. Such a response is not usually helpful to the Court. Second, that the Court may ask an attorney who is present for his or her comment does not make the attorney's court attendance necessary. Third, counsel could have called moving counsel to report its lack of opposition so the Court could be so advised by that attorney.

vigorously. In any case, the availability of funds may certainly be one factor considered in a request for interim compensation. *In re Four Star Terminals,* 42 B.R. 419 (Bankr.D.Alaska 1984). The cap is a fact neither A & F nor the Court can ignore and it is a fact that A & F should not have disregarded.[9] If the $20,000 cap is used up on needless court appearances and other unnecessary work, with the possibility of further compensation arising only upon approval of a plan, then the Committee counsel may be subject to subtle pressures to recommend some proposed plan of reorganization in order to receive added compensation for their work.

*Conclusion*

The reasonable value of A & F's necessary services demonstrated in its application was the $10,500 originally awarded. The disallowances already set forth hereinabove (for inadequate proof of the necessity of services, unnecessary duplication, unnecessary services and inflated time value for review) total $7,733.50. The balance of $2,810.00 ($21,043.50 sought less $7,733.50 disallowed less $10,500 awarded equals $2,810.00) was disallowed because of the following factors: that payment of attorney's fees is coming from the cash collateral of other creditors; a plan of reorganization has not yet been filed; the insubstantial results thus far obtained by Committee Counsel; and the desire of the Court not to see lessened future incentive for counsel to handle the case diligently. *Georgia Steel,* 19 B.R. at 839.

Nevertheless, on reconsideration there remains a good possibility that a plan may be confirmed, that the $20,000 cap may at some point be increased and that efforts of Committee counsel will be most significant in achieving a viable plan. If that happens, then A & F's request for that additional $2,810.00 will then not be unreasonable under those circumstances. Therefore, the additional $2,810.00 is disallowed without

prejudice to reconsideration after the plan is confirmed.

An order in accord with the foregoing will separately enter.

---

**9.** At the October 14, 1986 hearing, Ms. Feinstein stated that A & F was "at this point beginning to direct [its] attention and attempting not to appear in court when the committee or when counsel for the committee feels it is unneces-

sary and attempting to monitor these proceedings from [its] offices." *Transcript,* October 14, 1986 at p. 17. It is unclear why A & F could not have made such efforts much earlier.