In re CF & I FABRICATORS OF UTAH, INC., et al., Debtors.

(CF & I Fabricators of Utah, Inc.; Colorado & Utah Land Company; Kansas Metals Company; Albuquerque Metals Company; Pueblo Metals Company; Denver Metals Company; Pueblo Railroad Service Company; CF & I Fabricators of Colorado, Inc.; CF & I Steel Corporation and The Colorado & Wyoming Railway Company).

Bankruptcy Nos. 90B–06721–90B–06730.

United States Bankruptcy Court, D. Utah, C.D.

Sept. 18, 1991.

478

**480**

Ralph R. Mabey, Steven J. McCardell, Penrod W. Keith, Salt Lake City, Utah, and Frank Cummings, and Eunice L. Bumgardner, LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C., for debtors in possession.

Glenn K. Beaton, Beaton & Swanson, P.C., Denver, Colo., special patent counsel for debtors in possession.

John D. Faught, John Faught & Associates, Denver, Colo., special counsel regarding Supreme Court case number 89–1541.

David W. Furgason, and Randall J. Feuerstein, Welborn Dufford Brown & Tooley, P.C., Denver, Colo., special litigation and corporate counsel for debtors in possession.

Paul J. Toscano, Esq., and Vernon L. Hopkinson, Cohne, Rappaport & Segal, P.C., Salt Lake City, Utah, for Trustee, William J. Westmark, The Colorado & Wyoming Ry. Co.

Weston L. Harris, and Steven T. Waterman, Watkiss & Saperstein, Salt Lake City, Utah, for unsecured creditors' committee.

David D. Bird, U.S. Trustee, and M. John Straley, Salt Lake City, Utah, Asst. U.S. Trustee.

## MEMORANDUM DECISION AND ORDER REGARDING SECOND FEE APPLICATIONS

JUDITH A. BOULDEN, Bankruptcy Judge.

Few rulings in a bankruptcy case generate more outrage from the public, anxiety among attorneys, and tribulation for judges than the compensation of officers of an estate pursuant to 11 U.S.C. § 330.[1] This opinion attempts to clarify three disputed compensation issues by establishing guidelines that may aid future applicants and, in so doing, alleviate a measure of the concern generated by fee rulings. The issues raised by fee applications filed in this case are as follows: should time spent in preparation of fee applications be compensated; what constitutes reasonable compensation for paraprofessional persons; and, are flat-rate charges for the use of a telecopier actual and necessary expenses reimbursable by these estates. A short introduction to the nature of these cases is helpful.

On November 7, 1990, the debtors commenced their respective chapter 11 reorganization cases. Except for *In re The Colorado & Wyoming Railway Company*, in which a trustee has been appointed pursuant to 11 U.S.C. § 1163, all debtors are proceeding as debtors in possession. The debtors are a vertical group of steel production, manufacturing, and transportation companies, with assets listed at values in excess of $249 million. Liabilities against the estates include multimillion dollar environmental and tax claims, and claims filed by the Pension Benefit Guaranty Corporation totalling over $200 million.

Between the debtors in these jointly administered cases and the unsecured creditors' committee, over fifteen groups of professionals have been retained pursuant to section 327. Early in the case, a case management order was entered that provided fixed quarterly dates for hearings on all fee applications. The order also permitted monthly reimbursement of eighty-five

1. Unless otherwise noted, all subsequent statutory references will be to Title 11 of the United States Code.

percent of expenses incurred by professionals, subject to quarterly review by the court. Fee application hearings further defined allowable expenses.[2]

The case management procedure significantly streamlined the fee application process. The applications currently under advisement, however, raise issues regarding the amount that should be paid by these estates for fee application preparation,[3]

paraprofessional fees and telecopier charges.

## FEE APPLICATION PREPARATION

The applications for compensation submitted to the court represent a spectrum of charges for preparation of both expense and fee applications. A sample of the applications are summarized as follows:

| Law Firm[4] | Total Fees Requested on 1st App. | Total Fees Requested on 2nd App. | Fees Requested on 2nd App. for Fee Prep. |
|---|---|---|---|
| Beaton * | $ 2,488.75 | $ 1,752.00 | $ 425.00 |
| Choate | 29,817.25 | 64,093.70 | 1,458.00 |
| Cohne | 18,105.00 | 29,230.00 | 866.00 |
| Deloitte * | 61,880.00 | 43,465.00 | 7,275.00 |
| Faught * | 29,341.00 | 1,928.50 | 1,788.00 |
| LeBoeuf * | 328,692.15 | 288,393.03 | 21,540.15 |
| Watkiss | 69,757.00 | 60,559.50 | 2,690.00 |
| Welborn * | 71,104.00 | 123,891.00 | 24,537.00 |

* Denotes applications taken under advisement and included in this ruling.

**2.** The court ruled, in lieu of taking extensive evidence, that reimbursement for expenses for out-of-town travel would bear a ceiling equivalent to the current federal expense reimbursement rate for any particular city. Professionals who properly document their travel expenses may therefore be reimbursed according to the same scale, absent compelling arguments to the contrary. *See In re Western Co. of North America,* 123 B.R. 546 (Bankr.N.D.Tex.1991).

**3.** The American Bankruptcy Institute (A.B.I.) has conducted a comprehensive survey on compensation in bankruptcy cases and published the results of the survey in a May 1991 report. Am.Bankr.Inst., *American Bankruptcy Institute National Report on Professional Compensation in Bankruptcy Cases* (G.R. Warner rep. 1991).

The survey reflected that sixty-one percent of the judges

frequently allow[ed] compensation for the preparation and the presentation of fee applications at regular hourly rates. Only 17 percent reported that such time is not compensated at all. An additional 12 percent reported that they allow compensation at reduced hourly rates. Two percent reported that they allow compensation, but at a flat rate.

*A.B.I. Report* at 196–97 (footnotes omitted). Although the A.B.I. report provides a helpful indicator of the current practice of compensation allowance and a wealth of research references, the report offers no guidance to professionals in this case or to this court in resolving the issues before it and deciding what services should reasonably be compensated.

**4.** Key for shortened form of accounting or law firm name:

Beaton Beaton & Swanson, patent counsel for the debtors.

Choate Choate, Hall & Stewart, pension counsel to the unsecured creditors committee.

Cohne Cohne, Rappaport & Segal, general counsel for the Railroad trustee.

Deloitte Deloitte & Touche, accountants for debtors.

Faught John D. Faught & Associates, labor and OSHA counsel for debtors.

LeBoeuf LeBoeuf, Lamb, Leiby & MacRae, general bankruptcy counsel for debtors.

Watkiss Watkiss & Saperstein, counsel for the unsecured creditors committee.

Welborn Welborn, Dufford, Brown & Tooley, general corporate counsel for debtors.

Part of the disparity results from inconsistencies in how a particular service is classified. For example, LeBoeuf designated 156.20 hours as fee application preparation time. The court reviewed the application in detail and identified 233.94 hours that appear to relate to billing issues. Other applications have similar classification discrepancies, so that comparisons between the applications can be unproductive in the absence of uniform categorization.

Even considering those inconsistencies, there still exists a substantial disparity between the firms regarding the portion of time billed to the estate for fee or expense preparation. This opinion will attempt to resolve the apparent disproportionate requests and determine what services relating to fee preparation are compensable from the estate. Guidance provided by current case law and inquiry into the nature of the billing process are the starting point from which to resolve the issues.

## Current Case Law

Section 330(a)(1) permits courts to award "reasonable compensation for actual, necessary services ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title."[5] The same standard is applied by section 331 to interim compensation applications such as those before the court.

Bankruptcy courts generally compensate professionals for the time spent in preparing fee applications.[6] Certain courts have not allowed such compensation for various reasons that may be specific to individual cases.[7] Some bankruptcy courts have limited the compensable amount to a percentage of the total amount requested in the fee application. *See, e.g., In re Heck's, Inc.*, 112 B.R. 775, 793 (Bankr.S.D.W.Va. 1990) (three percent); *In re Churchfield Management & Inv. Corp.*, 98 B.R. 838, 887 (Bankr.N.D.Ill.1989) (three percent in the absence of unusual circumstances); *In re Chicago Lutheran Hosp. Ass'n*, 89 B.R. 719, 743 (Bankr.N.D.Ill.1988) (seven and one-half percent reduction not to be regarded as a rule of thumb); *In re By–Rite Oil Co.*, 87 B.R. 905, 917 (Bankr.E.D.Mich. 1988) (five percent reduction following

---

**5.** Welborn relies on *In re Permian Anchor Services, Inc.*, 649 F.2d 763 (10th Cir.1981) to support its contention that "reasonable" attorneys' fees should be allowed by the court. In *Permian,* the Tenth Circuit ruled that the guidelines for establishing reasonable attorneys' fees set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) should be applied to determinations of reasonable attorneys' fees in bankruptcy proceedings that involve construing contracts and notes which provide for the award of reasonable attorneys' fees. *Permian,* 649 F.2d at 768.

This court is in full agreement with Welborn and the *Permian* decision regarding allowance of reasonable attorneys' fees. The specific issue raised by these applications is whether all fees related to fee petition preparation are reasonable and, therefore, compensable.

**6.** Circuit courts that have examined this issue allowed some recovery for time spent preparing fee applications. *See In re Nucorp Energy, Inc.*, 764 F.2d 655 (9th Cir.1985); *In re Braswell Motor Freight Lines, Inc.*, 630 F.2d 348, 351 (5th Cir.1980); and *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088 (5th Cir.1980).

Within the Tenth Circuit, most bankruptcy courts allow compensation for time spent preparing fee applications. *See In re Kreidle*, 85 B.R. 573 (Bankr.D.Colo.1988) (allowed compensation for reasonable fees for reasonable time spent on the fee application); *In re Seneca Oil Co.*, 65 B.R. 902 (Bankr.W.D.Okla.1986) (allowed compensation where time was spent on the additional burden required by the Code); *In re TS Indus., Inc.*, 125 B.R. 638 (Bankr.D.Utah 1991) (compensation allowed only if not excessive or duplicative); *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557 (Bankr.D.Utah 1985) (allowed compensation but suggested a reduced rate).

**7.** *E.g., In re K & R Mining, Inc.*, 105 B.R. 394 (Bankr.N.D.Ohio 1989) (cost of doing business); *In re The Vogue*, 92 B.R. 717, 724 (Bankr. E.D.Mich.1988) (the applicant failed to prove that fee applications in bankruptcy cases are more burdensome than in other commercial cases); *In re Bonds Lucky Foods, Inc. No. 1*, 76 B.R. 664, 670 (Bankr.E.D.Ark.1986) (the court simply stated that the service was not compensable); *In re Mansfield Tire & Rubber Co.*, 65 B.R. 446 (Bankr.N.D.Ohio 1986) (no benefit conferred to estate); *In re Four Star Terminals, Inc.*, 42 B.R. 419, 436 (Bankr.D.Alaska 1984).

*Coulter v. State of Tennessee,* 805 F.2d 146 (6th Cir.1986) which established a five percent limitation in civil rights actions).

The rationale for imposing a specific percentage limitation on reimbursement has not been set forth in the case law.[8] It is this court's view that percentage ceilings inevitably foster the use of the ceiling as the norm rather than as an upper limit, or they encourage reclassification. Percentage limitations may also be misleading. In these cases, portions of the fees requested on the second applications related to preparation of the first applications, therefore, in order to apply a percentage limitation, complex recalculations must be made. Further, since no basis for differentiation between the various percentage discounts has been articulated, it is impossible to pick a percentage without being arbitrary.

Other bankruptcy courts allow time spent in preparation of the fee application at reduced rates or impose an across-the-board reduction on the fee application preparation time. *See, e.g., In re Pothoven,* 84 B.R. 579, 586 (Bankr.S.D.Iowa 1988) (compensation is "subject to reasonable limits"); *In re C & J Oil Co.,* 81 B.R. 398, 405 (Bankr.W.D.Va.1987) (seventy-five percent of the normal hourly rate); *In re Wabash Valley Power Ass'n,* 69 B.R. 471, 478 (Bankr.S.D.Ind.1987) (allowed at a lower rate because preparation of the application is of less benefit to the estate); *In re Neibart Assocs. Press, Inc.,* 58 B.R. 212, 215 (Bankr.E.D.N.Y.1985) (compensation was not to be "at the same rate as for demanding legal services"); *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 583–84 (Bankr.D.Utah 1985) (unspecified reduced rate).

A general statement that time spent preparing fee applications should be billed at a reduced rate does not provide guidance as to what rate should be charged. In this case, some of the professionals have independently reduced their applications by varying rates.[9] It is unfair to approve applications with different self-imposed reduction rates without an explanation.

■■■ A professional will generally be allowed a full reasonable hourly rate at the customary billing rate unless he or she performs work that could have been done by another at a lesser hourly rate. *In re Mayes,* 101 B.R. 494, 496 (Bankr.W.D.Mich. 1988); *In re Union Cartage Co.,* 56 B.R. 174, 179 (Bankr.N.D.Ohio 1986). Because the fee application is required by the bankruptcy court, the professional is entitled to the reasonable market rate for time in fulfilling that requirement. *See, In re Nu-Corp Energy, Inc.,* 764 F.2d 655 (9th Cir. 1985).

The issue of how much the estate should pay for fee preparation must be put in perspective. Professionals are required to account for their time for a variety of reasons. The information is vital in billing clients and is also used extensively for the professionals' own purposes, such as determining salary structure, bonuses, and eligibility for advancement for employees within the firm. Furthermore, professionals customarily factor into their hourly rate the noncompensable time for keeping contemporaneous time records. Almost universally, the professionals in this case reported that they do not charge clients for the time spent in bill preparation in non-bankruptcy cases.

8. The courts either do not provide a rationale for the specific percentage limitation or adopt rationales similar to the following statements: "[T]ime spent preparing ... a fee application ... must be reasonable." *Chicago Lutheran,* 89 B.R. at 743; or "More [than three percent of the total hours] is not generally necessary or reasonable." *Churchfield,* 98 B.R. at 877.

9. Cohne's application discloses that one attorney reduced his time billed to fee preparation by 50% on February 14, 1991, and 20% on February 25, 1991. Another attorney in the firm does not indicate any reduction. Choate reduced their application from $1,458 to $1,312.20, a reduction of 10%. Deloitte reduced their fees by 50%. LeBoeuf identified 4.85 hours for which it did not charge the estate, and withheld 10% of its national rate fees pending final allowance of fees. Watkiss reduced their application from $2,690 to $2,421, likewise a reduction of 10%. Welborn wrote off $5,335.50 from its application, and is willing to reduce its fees by 10%, provided it would be able to apply for the fees at the final fee application hearing.

### The Billing Process

Perhaps the proclivity of courts to disallow compensation, mandate percentage ceilings or, reduce hourly rates stems from the tendency to view the preparation of the fee application as a whole, rather than as a process consisting of various components. Each of the steps of the process of fee preparation should be individually examined to determine the nature and value of the service to the estate before arriving at what is reasonably compensable under section 330(a)(1) and 331.

The arguments of counsel provide guidance regarding the billing practices of the firms employed in this case. On a generalized basis, the billing process can be broken down into the following steps: 1) posting contemporaneous time records by the applicant, 2) billing accumulated recorded time and editing the bill, 3) exercising billing judgment, 4) producing the fee application and preparing the pleadings including application narratives, 5) redacting entries or other specialized services, and 6) reviewing and responding to objections and attendance at the hearing. When the component parts of the preparation process are viewed separately, it is apparent that some aspects of fee application preparation should be charged to the estate and some are simply overhead. The analysis applies whether the time spent is preparing applications regarding fees, or is limited to time spent preparing expense applications.

*1. Posting contemporaneous time records.* The bane of most lawyers is filling out time sheets. But without them, neither clients, salary review committees, nor the court could make informed decisions regarding the efficient use of a professional's time.

■ It is apparent from some of the fee applications submitted that contemporaneous entries related to fee preparation time are often incomplete, contain unclear references to services performed, or are not broken down into one-tenth hour increments, and required extensive editing. If the entries were of a nature that must eventually be redacted,[10] some of the law firms did not establish a system prior to recordation that facilitated subsequent editing.

Some complaint was expressed by those professionals not used to practice in bankruptcy court regarding the onerous time-keeping requirements of bankruptcy courts. The argument is noted but not well taken. Professionals hired by the estate accept employment knowing they will be required to account for their time in detail. The debtors, after all, are in bankruptcy and the professionals are being paid by a fiduciary estate under court supervision. Professionals should have been aware of the necessity to keep detailed records prior to or at the time they sought employment as a professional of the estate.

The difficulty is not so much the onerous requirements of the court, as it is a failure to properly educate the professional performing the task to keep detailed records at the outset of the case. *See generally, In re Pettibone Corp.*, 74 B.R. 293, 304 (Bankr.N.D.Ill.1987) (counsel should keep their time records so that fee applications can be prepared and narrated both quickly and efficiently). If the professional is educated in advance and adequately trained, record-keeping should not be burdensome. If, however, proper records are not kept and must be extensively edited, the process is indeed burdensome; but that is not the estate's burden. Ordinary record keeping is part of doing business. Time records are used for a variety of reasons unrelated to the allowance of fee applications and any additional requirement imposed by the court should have been known in advance. Keeping time records is an integral aspect of bankruptcy representation and is not entitled to additional compensation.

---

10. Several of the estates' professionals are engaged in litigation in which the opposing party is a member of the unsecured creditors' committee. To prevent disclosing work-product, waiving the attorney-client privilege, or revealing litigation strategy, the court allowed redacted applications to be filed on a limited basis. An unredacted version was filed under seal. Generally, the unredacted versions contained many items that, without prejudice, should have appeared on the public applications.

One aspect of the complaint regarding the requirement to keep detailed time records warrants separate discussion and different treatment in light of the nonbankruptcy professionals employed in this case. Several professionals have requested compensation for time spent corresponding and teleconferencing with LeBoeuf, the unsecured creditors' committee, or the United States Trustee regarding the standards for fee applications in this jurisdiction. In fulfilling the direction given by the court to LeBoeuf to manage the professionals as any house counsel would, LeBoeuf has likewise billed over 12 hours educating the various professionals, 5.2 hours conferencing with the United States Trustee, and 6.10 hours conferencing with the creditors committee.

■ Is time spent researching how to prepare a fee application compensable? Generally, the answer is no if the professional regularly practices in this area. *S.T.N. Enters.*, 70 B.R. at 838 (since a standard of competence must be presumed, general research on law well known to bankruptcy practitioners should not be charged to the estate). However, the debtors employed several of these professionals prior to filing and same specialize in greatly disparate non-bankruptcy areas of the law. A standard of competence or knowledge regarding fee preparation cannot be presumed and it is an attorney's professional responsibility to engage in the necessary study to provide adequate client representation, including how to be paid.

■ It is unfair to require LeBoeuf to educate, and the professionals to research this area, then refuse to compensate the effort. Therefore, the court is willing to compensate both LeBoeuf and the other applicants for a reasonable amount of time spent educating themselves or others on law which would otherwise be well known to bankruptcy practitioners. Given a small amount of instruction, however, these billing concepts should not be difficult to grasp. The court notes LeBoeuf billed 9.4 hours educating its own employees regarding proper recordation techniques. Since LeBoeuf has a well deserved reputation for bankruptcy expertise, it is unreasonable that this charge should be paid by the estate.

■ *2. Billing and editing.* Posting the information contained in the daily time sheets into an accounting system and printing the bill is a routine overhead expense which is analogous to accounting procedures any commercial enterprise maintains in order to bill its clients and make a profit from the services it provides. *In re Seneca Oil Co.*, 65 B.R. 902, 910 (Bankr. W.D.Okla.1986) (because a "detailed billing summary ... is generally prepared by a professional for a client, those efforts do not represent an additional burden"); *see also In re WHET, Inc.*, 62 B.R. 770, 780 (Bankr.D.Mass.1986).

For example, time spent in collating time sheets into a solitary document is not compensable because the expense is overhead. *In re Gold Seal Products, Inc.*, 128 B.R. 822 (Bankr.N.D.Ala.1991) (no compensation allowed for overhead expenses that should be built into professional's hourly rate); *In re Bicoastal*, 121 B.R. 653, 655 (Bankr. M.D.Fla.1990); *In re Convent Guardian Corp.*, 103 B.R. 937 (Bankr.N.D.Ill.1989) (overhead expenses are built into hourly rate and not compensable); *In re S.T.N. Enters., Inc.*, 70 B.R. 823, 839 (Bankr.D.Vt. 1987); *In re United Rockwool, Inc.*, 32 B.R. 558, 561–62 (Bankr.E.D.Va.1983); *In re Liberal Market, Inc.*, 24 B.R. 653, 661 (Bankr.S.D.Ohio 1982). *See also Nucorp*, 764 F.2d at 659 n. 5 (work involved in preparing a fee application is an "actual and necessary" service, but overhead expenses are not recoverable).

■ If errors have been made, entries are incomplete or inconsistent with those of other professionals, and time records require editing to comply with court standards, such editing services are clerical functions and not compensable, even though they may be performed by a professional. LeBoeuf listed 56 hours described as revising and editing detailed billing reports regarding rate changes, hours billed, calculations, tracking costs and expenses, or sending the bill to the debtors. Proofreading the data contained in the ap-

plication, as with any other clerical or secretarial task, is not compensable. Mistakes may be made, and certainly should be corrected, but the time spent finding and correcting them is overhead.

 A computer billing package used by a professional that does not retrieve information in a format compatible with bankruptcy requirements and requires revisions to rectify the inadequacies, is not a deficiency the estate should pay for. For example, Welborn ordinarily provides cost itemizations at the end of their monthly service bills for submission to the debtors. In order to repeat the information contained in the monthly expense reports on fee applications, Welborn must reenter some of the entries by hand. There is no reason the estate should bear the burden of compensating this additional expense for hand posting because Welborn's computer accounting package is not flexible enough to reprint the data. A portion of the $2,520 allocated by Welborn to monthly fee statements is for this service, the balance is for preparing and editing the monthly bill. These charges are not compensable.

 In the event some extraordinary expense is incurred because of the bankruptcy filing, that expense should properly be charged as a cost to the estate. As an example, some of the applications filed with the court had to be bound. The court notes that it simply is not possible to file a two-inch thick document without some type of binding. This cost is compensable, as are copying costs incurred to properly circulate the applications.

 *3. Exercising billing judgment.* The United States Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L Ed.2d 40 (1983), a nonbankruptcy case, stated that attorneys applying to a court for statutory attorneys' fees should make a good faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary; just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important

here." *Hensley,* U.S. at 434, 103 S.Ct. at 1939–40, *quoting Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980). The standard of section 330 that compensation be for actual and necessary services makes the exercise of "billing judgment" a mandatory requirement in bankruptcy fee matters. *See In re Pettibone,* 74 B.R. 293, 303 (Bankr.N.D.Ill.1987) (suggesting several examples of the appropriate exercise of billing judgment).

 Some courts have denied compensation for time spent reviewing bills. *In re Cuisine Magazine, Inc.,* 61 B.R. 210, 217 (Bankr.S.D.N.Y.1986). Other courts have allowed limited time spent for review. *Bicoastal,* 121 B.R. at 655; *S.T.N. Enters.,* 70 B.R. at 839; *Union Cartage,* 56 B.R. at 178 (allowed at lower rates). Once again, it clarifies the issue to determine the purpose of the review. A review that is in reality an edit for accuracy is a clerical function and not compensable. When the review is undertaken in order to evaluate competent utilization of firm resources, is a matter usually not billed to nonbankruptcy clients, and is done for internal and firm management purposes, it should not be billed to the estate.

If, however, a partner or other senior professional is analyzing on a cumulative basis whether the services performed were efficient, productive, nonduplicative and generally fair, the review is of great benefit to the estate, reasonable and compensable. The estates' professionals are ethically required to adjust for unproductive time, training, office management, or continuing legal education. Such analysis includes adjustments for the coordination of several services performed for the estates, such as that done by Welborn representing the debtors in more than twenty-five discrete matters, or LeBoeuf coordinating the services of its twenty-four attorneys and four paralegals.

Review of a bill by a senior professional to analyze employee efficiency and eliminate wasteful duplication or inflated charges by inexperienced employees is an extremely valuable service to the estate.

A senior professional's sound judgment is worth full compensation by the estates and should ultimately result in savings to the estates. Such an examination is expected by the court, relied upon by the court and will be fully compensated by the court. "[S]enior partner rates will be paid only for work that warrants the attention of a senior partner." *In re Wiedau's, Inc.*, 78 B.R. 904, 908 (Bankr.S.D.Ill.1987).

 *4. Producing the application and preparing the pleadings.* The time reasonably required to produce the pleading may be billed at the regular hourly rates, but *only* if the preparation was performed efficiently.[11] If possible, initial drafting of the fee application should be performed by a paraprofessional. *See United Rockwool*, 32 B.R. at 561–62 (preparation of the application for compensation "should be done largely by paralegals or assistants rather than attorneys"), *citing In re Erewhon, Inc.*, 21 B.R. 79, 89–90 (Bankr.D.Mass.1982). *See also Neibart*, 58 B.R. at 215 (services not truly legal in nature should not be charged at the rate of an experienced attorney).

 Time spent preparing the narrative section contained in the fee application pleading is a service unique to bankruptcy, is extremely helpful to the court and should be compensated. *Bicoastal*, 121 B.R. at 655; *In re Ginji Corp.*, 117 B.R. 983, 989 (Bankr.D.Nev.1990). The narrative summarizes the data contained in the application in intelligible form and instructs the court as to the substance and benefit of the services performed. It is not necessary that the narrative be a comprehensive dissertation on all possible aspects of the issues involved. The narrative should also be commensurate with the stage of the case. LeBoeuf has 28.7 hours identifiable as narrative preparation, which is rather a lot of time to produce a 29 page document. At least the majority of the time was spent

by those with lower hourly rates. Preparation of the narrative should be performed by the most efficient, informed professional or paraprofessional. *Ginji*, 117 B.R. at 989. The service is sufficiently valuable and unique to bankruptcy that it should be fully compensated.

*5. Redacting entries.* Several applicants edited their fee applications to eliminate potential disclosures that could impair litigation or client confidentiality. In order to provide maximum disclosure to all interested parties and still maintain the confidentiality required to effectively and economically litigate the issues, it is incumbent upon the applicant to use extreme care when excising portions of the applications which are made available to the public. "In bankruptcy court, applications for interim compensation are somewhat different since they are considered prior to end of litigation and while there may be confidences and secrets which should not be violated. Should this situation arise it is suggested that the court consider such applications or portions thereof *in camera*." *In re Wilson Foods*, 36 B.R. 317, 320 n. 2 (Bankr. W.D.Okla.1984).

 Deletions must not eliminate portions that should reasonably appear on the public applications. If the full description of legal services performed must be protected, a much better practice would be to obtain a protective order, as opposed to redacting descriptive entries. The professional should weigh the necessity for confidentiality against the mandate to fully disclose to all parties the basis for the fees requested.

 The time spent in editing time entries prior to their submission to the court should not consume an inordinate amount of time, especially when the need for editing could be completely eliminated. Redacting should be performed by an indi-

---

**11.** "It is important that attorneys practicing in the Bankruptcy Courts prepare fee applications efficiently. If they are to be paid under 11 U.S.C. § 330 like attorneys outside this practice field (who are not usually paid for preparing their bills or providing explanatory detail), they must maintain records to provide all necessary fee information efficiently—as do most attorneys in the profession." *Churchfield*, 98 B.R. at 867. "The attorney and paralegal time reasonably required to generate these detailed time and expense records is compensable." *In re Thacker*, 48 B.R. 161, 165 (Bankr.N.D.Ill.1985), *citing Rose Pass*, 615 F.2d at 1093.

vidual fully versed in both the nature of the litigation and potentially harmful disclosures. The individual's level of expertise may be reflected in the appropriate hourly rate charged. Where multiple attorneys are involved, as in the Welborn application with over 17 attorneys engaged in various matters, efficiency is required to prevent duplication of effort.

■ *6. Reviewing and responding to objections, and attendance at the hearings.* Reviewing objections filed against a fee application and the time spent appearing in court to present the application is compensable, as long as a certain amount of discretion is used. *In re Nucorp Energy, Inc.*, 764 F.2d 655, 661–62 (9th Cir. 1985). Defending fees is, after all, a self serving exercise. But educating the court so that it can make an informed judgment is a valuable service to the estate. In cases such as this with both an active creditors' committee and the United States Trustee, significant time can be spent reviewing applications, but in the end the estate will probably benefit. The professional performing the service should have skills commensurate with the complexity of the disputes involved. It is not necessary to have more than one attorney attend the hearing and excessive preparation for the hearing will not be allowed. *See, e.g., Pettibone*, 74 B.R. at 303; *United Rockwool*, 32 B.R. at 561.

At the hearing on these applications the court allowed portions of the applications, but held back amounts for specific applicants pending a ruling on this issue. The court now applies the criteria set forth above to the applications under advisement.

The order allowing Beaton's fees is modified to allow the time spent at the fee hearing on March 26, 1991, [sic] and reduce the rate for time spent on February 26, 1991, to $120.00 per hour, for a total allowed fee of $1,451.43. The order allowing Faught's fees is modified to disallow the duplicative appearance at the March 27, 1991, hearing and to disallow 1.4 hours on

March 27, 1991, for duplicative drafting, resulting in total allowed fees of $1,516.00.

■ The Deloitte application, even as modified contains no itemization, merely recites a period of time, rounded to the nearest one-half hour, and merely includes the description "billing preparation". The total fees requested are $14,550 discounted 50% to $7,275. The court finds it impossible to allow or disallow specific entries according to any meaningful criteria. The court has provided Deloitte with sufficient opportunity to revise its application and it is apparently unable to do so. Therefore, the $7,275 requested is disallowed without prejudice. Deloitte may resubmit a fee application which conforms with announced standards of bankruptcy practice for reconsideration by this court.

Welborn's application contains information so that the court can make an informed decision, including whether paraprofessional support is performing compensable services, or clerical services. Of the total time set forth on the application, $6,192 is disallowed as being comprised of clerical time and time spent billing accumulated recorded time and editing the bill. Fees in the amount of $484.00 which are described as editing errata for the application is disallowed as noncompensable editing. Fees in the amount of $722 can be identified either as research into billing standards in this jurisdiction, or educating staff members about that topic. The court will allow one-half of that amount, or a deduction of $361. Fees in the amount of $3,868 are described as preparation for the hearing on the application, or accumulating information to be used at the hearing. This total excludes time identified as responding to objections of various parties. While the court appreciated Welborn's presentation, the time spent in preparation for the hearing was excessive. In consideration of the length of the hearing and Welborn's participation therein, two-thirds of that amount is disallowed, or $2,578.67.

The court disallows $1,723.00 of the time spent by LeBoeuf educating its employees regarding billing practices.[12] The court

12. The following specific amounts are disal-

lowed: .30 of C*S's time at a rate of $140 per

further disallows a total of $8,762.00 of the time spent editing the applications and detailed billing reports.[13] LeBoeuf itemized 27.8 hours as preparation for the fee application hearings. The court is cognizant that a considerable portion of this time related to applications other than LeBoeuf's, and that only a portion of the time was billed for presenting its own application. LeBoeuf lists 11.6 hours, however, for F–C's preparation for the hearing. Just as the court appreciated Welborn's presentation, the effort of LeBoeuf to educate the court regarding the issues in the case is acknowledged. Two-thirds of the amount will be disallowed as unreasonable, for a reduction of $2,781.60.

## PARAPROFESSIONAL TIME

Objections have been filed to those portions of LeBoeuf's application relating to time charged to these estates by one of the firm's paralegals, hereinafter referred to as the LBP. The argument is that the charges attributable to the LBP are overhead because they are secretarial or clerical [14] in nature, and do not represent traditional paralegal services that are separately compensable. Put another way, would Perry Mason bill Della Street as a secretary or a paralegal? Perhaps the answer

lies in whether you are viewing in black and white, or in color. Innovative use of sophisticated computers can now itemize each person's work in detail. As a result, it is the current trend in firms to shift tasks from lawyers or clerical personnel to paraprofessionals in order to save costs for clients. This practice also enables firms to augment the attorney's hourly billing rate without raising it, recapture more of the expenses of doing business and, in some cases, provide a profit[15]. But just because a computer can isolate a task and bill it separately, or because a person has a paraprofessional title, does not mean all services performed by that individual are separately compensable.

If the services provided by the paraprofessional represent a shift of tasks ordinarily performed by a lawyer or other professional, and the service is reasonable and necessary, the service is compensable. If clerical or secretarial services shift to the paraprofessional, the service is overhead and not a reasonable charge to the estate.[16] To determine which is which, the court can look at the kind of services that are traditionally charged to overhead, the amount of discretion allowed to the paraprofessional, the experience or education required to accomplish the assignment, the

hour; 4.0 hours of ELB's time at a rate of $205 per hour; .70 of PWK's time at a rate of $130 per hour; 4.40 of SJM's time at a rate of $175 per hour.

13. The following specific amounts are disallowed: 19.2 hours of C*S time is disallowed at a rate of $140 per hour. 4.10 of LWM's time is disallowed at a rate of $55 per hour. 11.4 hours of PWK's time is disallowed at a rate of $130 per hour. 21.3 hours of ELB's time is disallowed at a rate of $205 per hour.

14. "Overhead, for the purpose of determining reimbursable costs in bankruptcy cases, includes all continuous administrative or general costs or expenses incident to the operation of the firm which cannot be attributed to a particular client or case. The term ... may be exemplified by such items as rent, taxes, insurance, lighting, heating, and other office expenses, including secretarial services." *Jensen–Farley*, 47 B.R. at 584. *See also, In re Kreidle*, 85 B.R. 573, 576 (Bankr.D.Colo.1988) (customary, routine overhead expenses are not, generally, billable against a debtor's estate).

15. As an example, the paralegal charge to the estate for the LBP in this three month application is $21,604 (392.80 hours times $55 per hour.) At that rate, a yearly fee of $86,416 would be charged, or $7,201 per month. No evidence presented to the court indicates the amount that is being paid to LBP, but even assuming liberal salary and costs to maintain the employee, in this market the charge appears to be a profit item.

16. The court's determination as to whether specific services are compensable or not, does not bear on the value or necessity of the services to the estate, for without certain clerical services the administration of the estate may come to a standstill. The issue focuses on whether additional compensation for the services is reasonable, or whether payment for the service is included in overhead and the rate charged to the estate by the professional. *See In re Yankton College*, 101 B.R. 151, 159 (Bankr. D.S.D.1989) (legal secretaries are an integral part of a law firm, but their services are part of office overhead).

responsibility delegated to the paraprofessional and the amount of supervision retained by the professional.

To determine which services or tasks are traditionally overhead, a distinction must first be drawn between services performed by a paraprofessional for an attorney representing a trustee or debtor-in-possession, as opposed to services traditionally performed by a paralegal. The distinction is not mere semantics. Paraprofessionals are used differently by an attorney for a debtor-in-possession than paralegals are traditionally used by lawyers in other areas of the law.[17] Unless the distinction is recognized, analysis of whether the paraprofessional's services are separately compensable is confusing.

According to a statement issued by the American Bar Association (A.B.A.) Standing Committee on Legal Assistants, the legal assistant or paralegal is defined as:

[A] person, qualified through education, training, or work experience, who is employed or retained by a lawyer, law office, governmental agency, or other entity in a capacity or function which involves the performance, under the ultimate direction and supervision of an attorney, of specifically-delegated substantive legal work, which work, for the most part, requires a sufficient knowledge of legal concepts that, absent such assistant, the attorney would perform the task.

*American Bar Association Standing Committee on Legal Assistants: Position Paper on the Question of Legal Assistant Licensure or Certification,* at 4. December 10, 1985.

In 1984, The National Association of Legal Assistants, Inc. adopted a similar description:

Legal assistants (also known as paralegals) are a distinguishable group of persons who assist attorneys in the delivery of legal services. Through formal education, training and experience, legal assistants have knowledge and expertise regarding the legal system and substantive and procedural law which qualify them to do work of a legal nature under the supervision of an attorney.

*Facts & Findings: The Official Publication of the National Association of Legal Assistants, Inc.,* Vol. 18 (July 1991) cover page.

The statutory standard upon which the court determines reasonable compensation, section 330(a)(1), does not use the term paralegal or legal assistant. Section 330(a)(1) uses the broader term paraprofessional.[18] Is the distinction just a stylistic difference to make the term relate to trustees and non-lawyer professionals, or is the terminology intended to broaden the scope of compensable services? The legislative history of this subsection provides some guidance. The rationale for the inclusion of paraprofessional compensation is "to reduce the cost of administering bankruptcy cases.... [and] to use paraprofessionals ... where the work involved could easily be handled by an attorney's assistant, at much lower cost to the estate." H.R.Rep. No. 595, 95th Cong., 1st Sess. 329–30 (1977). Additionally, paraprofessionals may be "employed to perform duties which do not require the full range of skills of a qualified professional." S.Rep. No. 989, 95th Cong., 2d Sess. 40–41 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5825, 5827, 6285, 6286.

A review of LBP's services illustrates the distinction between paralegal and paraprofessional services. Few of the LBP's services described in the application relate to substantive legal work in the same sense

---

**17.** Paraprofessionals are those associated with and who substantively assist professionals such as lawyers, accountants, auctioneers, and appraisers and are intimately involved in the estate's administration. Paraprofessionals include law clerks, paralegals, legal assistants, and estate administrators or managers.

**18.** That section provides for "reasonable compensation for actual, necessary services rendered by ... any paraprofessional persons employed by [a] trustee, professional person, or attorney, ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title." 11 U.S.C. Section 330(a)(1).

one might think of a paralegal capable of researching and drafting an outline of a brief, Shepardizing case law, digesting and indexing depositions, or interviewing clients. Of 392.80 hours the LBP billed to the estate this quarter, 2.1 were spent drafting correspondence, memos or pleadings, and only 1.8 hours were spent on legal research. Analysis of the LPB's time entries in relation to the label of "paralegal" is misleading. If the time entry is not for research, drafting, or "substantive or procedural legal work," the implication arises that the time must be secretarial or nonlegal in nature, which would ordinarily be classified as overhead and would not be reasonably compensable.

The use of the term paraprofessional in the statute allows inclusion of another layer of individuals employed in bankruptcy cases that are, in essence, estate managers. Such individuals assist in the administration of the assets of the estate and ensure compliance with the duties required by the Code of a debtor-in-possession. These estate managers are paraprofessionals but are not legal support staff in the classic sense. Nonetheless, these individuals provide essential assistance to the estate that is more than clerical overhead, but something different from substantive legal service.

This case is one of the largest filed in this district to date and a variety of case management techniques were adopted to deal with the logistics of the case.[19] It is reasonable and necessary that some person with a knowledge of legal procedures, bankruptcy court practices, and most im-portantly managerial skill, be employed to manage the administration of the case. Such administration does not necessarily require substantive or procedural legal work. Administration of this case does require that a person sufficiently skilled by experience or education be available to exercise discretion and accept significant responsibility for administration of the estate. Depending upon the nature of the service performed, these tasks may or may not be compensable.

If the service involves analysis of documentation utilizing the education or experience of the paraprofessional, broad responsibility for data and copy management control, or discretion regarding dissemination of information to the public, the services are generally beyond the functions usually performed by secretarial or clerical staff. Therefore, these services performed by the LPB are compensable because these services are not traditionally charged to overhead. A review of the LBP's services illustrates the dichotomy between compensable and noncompensable services.

The application reflects 145.90 hours analyzing incoming documents, preparing coversheets and routing the documents to over 25 attorneys or paralegals assigned to various aspects of the case. To the extent these entries represent actual analysis and routing of documents that applied the LBP's specific education or experience, the time is compensable and will be allowed.[20]

The LBP spent 10.4 hours in consultation with the court that was related, in

---

19. A separate computer was installed by the clerk's office to track claims and pleadings. Updates of the data are transferred to the Debtors on a daily (docket) and weekly (claims) basis to be used to assist in drafting a plan, in resolving claims litigation, and administering the estate. A commercial copy center was retained to distribute pleadings to interested parties. Both the computer and the copy center require additional administrative attention. The LBP's phone was listed on the notice of bankruptcy that went to the creditors in the joint cases and she fields creditors' calls. LeBoeuf also receives a multitude of pleadings and correspondence daily, and the LPB is charged with analyzing the documents, preparing a coversheet for each doc-ument, and routing it to one of the twenty-six or so attorneys or paraprofessionals involved in the case. The LBP also "interfaces" with the court, coordinating hearings, bringing to the court's attention discrepancies in the docket or claims register, and generally seeing that the case runs smoothly.

20. The court notes that none of the time related to coversheets itemizes copying pleadings, delivering documents, collating or sorting. All of those services are clerical and are not compensable. Only time spent analyzing the documents and determining their routing is recoverable.

part, to correction of court records. That time is allowable because it evidences utilization of specific education and broad discretion to determine the appropriate method of correcting errors. The function is of such importance that the services would be performed by the professional, if not by the LBP.[21]

■■■■ The LBP spent 12.2 hours taking instruction from her employers. That amount of time is reasonable in light of the complexity of the case and corresponds with the professional's responsibility to supervise her work. She also billed 3.1 hours for managing the copy center, and 1.9 hours for managing the transfer of data from the court's computer to the debtors', both managerial services indicating a general delegation of responsibility that would have been performed by the professional, if not the LBP.

■■ The LBP spent 7.6 hours researching issues related to specific claims of creditors and 23.1 hours reviewing claims. The itemization regarding the LBP's review of claims is not specific, but to the extent it indicates an analysis of the allowability of the claims under sections 501 or 502, the time is compensable and demonstrates specific education or experience above that commonly held by secretarial or clerical staff.

■■ Responding to creditor inquiries accounted for 38.0 hours of the LBP's time. This service required both specific education and discretion related to what information is appropriate to give to a particular creditor. All these above-referenced services to the estate are non-clerical in nature, would have been performed by a professional absent hiring the LBP and are compensable at reasonable rates.

■■■ If the service performed by a paraprofessional consists of typing, data entry, checking court dockets or court dates, manually assembling, collating, marking, processing, photocopying, or mailing documents, the task is clerical in nature and not compensable.[22] Such tasks are traditionally charged to overhead and included in the professional's hourly rate. *Ginji,* 117 B.R. at 995; *In re Nashville Union Stockyard Restaurant Co., Inc.,* 54 B.R. 391, 396 (Bankr.M.D.Tenn.1985). If no singular education or experience is required, if the service requires extensive supervision by the professional, or if there is no discretion involved, the service is not specifically compensable. The application reflects 24.5 hours spent updating the master service list, directories, mailing lists, returned mail lists or appearance lists. This service does not require special education or experience and is clerical in nature, involving only comparison of a specific document to a list, and would not likely be performed by a professional.

■■■ The LBP billed 24.8 hours for updating the claims registers, and for the same reason, compensation is not allowable. The LBP described 34.6 hours of her time as compiling claims, organizing them in numerical or alphabetical order, updating the database, numbering documents, setting up books, or printing claims reg-

21. With one exception. A significant number of entries indicate inquiry by the LBP as to whether various orders had been signed prior to the expiration of time for objection. If the firm wishes to track these documents on a routine basis, in addition to having copies of the docket sheet, it does so at its own expense. No purpose is served by inquiring if a thing is done before it is possible to do it.

22. *Matter of Environmental Waste Control,* 122 B.R. 341 at 347 (Bkrtcy.N.D.Ind.1990) (time spent organizing files, making copies, and delivering papers was clerical in nature even if performed by a paralegal); *Bicoastal,* 121 B.R. at 655 (no compensation allowed to paralegals for organizing files, copying documents, checking the docket, updating files, checking court dates, and delivering papers); *In re Belknap, Inc.,* 103 B.R. 842, 845 (Bankr.W.D.Ky.1989) ("paralegals should not be used to perform tasks which are clerical in nature"); *In re Prairie Cent. Ry. Co.,* 87 B.R. 952, 959 (Bankr.N.D.Ill.1988) (the court denied compensation to paralegals who performed trustee's work rather than legal work); *Bonds,* 76 B.R. at 671 (the court noted the potential abuse of paralegals where the debtor is required to pay a paralegal "to perform not attorney tasks, but tasks which were previously performed by a competent legal secretary without additional charges to the client"); *In re Horn & Hardart Baking Co.,* 30 B.R. 938 at 942 (Bkrtcy.E.D.Pa.1983) (the court disallowed

isters. All those services are clerical in nature and are not allowable.

■ The LBP spent 19.2 hours updating or reviewing the court's docket sheet. Once again, the actual comparison of docket sheets to pleadings is clerical. If an inconsistency is found by the clerical staff, the method employed to correct that error is a paraprofessional task and has been allowed.

■ Document control accounts for 5.2 hours of the LBP's time. This function is described as organizing excess copies, organizing books, compiling reports or preparing packages for service. Of 10.5 hours related to fee applications, 3.3 hours appears to have been spent editing or proofing the LBP's portion of the LeBoeuf application. The LBP attributed 2.7 hours of the total fee time to drafting logs to record telecopies and federal express expenses.[23] These activities are all clerical in nature, are overhead, and are not separately compensable.

■ If the service performed is allowable as a paraprofessional charge to the estate, the court must determine the appropriate rate to be charged. Just because the nature of one service is paralegal, and another is nonlegal paraprofessional, does not indicate one rate should be higher than the other. The differentiation should be based on the amount of responsibility delegated by the professional, the amount of specific education or experience required to perform the task, and the amount of discretion allowed to the paraprofessional, as well as the common factors applied to setting any rate for professional fees in bankruptcy. Stated in different terms, the amount requested for services of paraprofessionals should be "reasonable in relation to the services rendered." *In re Central Pacific Boiler & Piping, Ltd.*, 88 B.R. 277, 278 (Bankr.D.Haw.1988). Paraprofessionals with broad managerial skills, experience

and qualifications, who are responsible for administering estate assets, taking custody of vital documents, interacting with the public, and planning the administration of the estate are rendering necessary services to the estate. Paraprofessionals who possess these skills provide services which are compensable at rates equivalent to those of certified paralegals skilled in researching complex legal issues and capable of drafting legal pleadings.

■ Where a fee application requests compensation for a paraprofessional's work, that individual's experience and qualifications should be noted on the first fee application in which the request appears. *See In re Carter*, 101 B.R. 170, 175 (Bankr.D.S.D.1989) (the qualifications "should be established to justify the charge"). The court recognizes that an accredited degree or license is not a necessity, but that the individual's paraprofessional status may be achieved through several years of work experience. That fact should be noted when listing the paraprofessional's qualifications. In this case, no specific qualifications were set forth for the LBP, but the court notes that this individual had several years of experience as a former employee of this court.

■ The LBP's hourly rate rose from $45 in 1990 to $55 in 1991.[24] The very high end of the scale in this market for paralegals is $55. Only those employed as paralegals or paraprofessionals for several years are billed at $55. Two months of work on this case is insufficient experience to justify a $10 per hour rate increase. The court will allow a more appropriate rate of $45 per hour for the LBP's compensable services.

### TELECOPIER CHARGES

At some point years ago, the technological advance of photocopy machines eliminated the scrivener's function of hand

hours for paralegal time spent in file maintenance).

23. At a prior fee hearing this court expressed concern that telecopier and federal express charges be properly itemized, and not used where ordinary mail services were available. These fees apparently relate to that request.

24. The case was filed in November, 1990. The application indicates this paralegal is billed at $65 per hour for 1990 and $70 per hour for 1991 on matters of national scope involving other major clients of the firm.

copying documents. Photocopy machines enabled copies to be made more quickly and efficiently, saving immeasurable time and resulting in less cost charged to the estate. The first copying cost charges were higher because the machines were relatively expensive. The actual cost charged to bankruptcy estates reflected the actual expense.

Now, telecopier charges are in much the same stage of evolution. This new technology enables the billing party to break down charges to the estate on an actual cost recovery basis. An objection to the $3,490.49 billed at $2.00 per page for the telecopier services by LeBoeuf was premised on the grounds that the telecopier charges did not represent the actual charges of printing an incoming facsimile (paper, toner, or ink), or the actual charges for a telephone call on an outgoing facsimile copy. Furthermore, the objectors argued that the flat rate should not represent amortization of the cost of the facsimile machine, a cost that represents capitalization of an equipment purchase.

The statutory standard upon which the court determines reasonable compensation for expenses is found in section 330(a)(2) that provides for "reimbursement for actual, necessary expenses." LeBoeuf established its charges in relation to a survey of the charges from other firms in this area. LeBoeuf's survey also included commercial rates of companies specializing in photocopying and fax transmission. Although the court in *Seneca*, 65 B.R. at 913, allowed photocopying at rates "comparable to the rates charged by commercial shops in the area" as "obviously reasonable," the court added that the "estate should be required to bear only the actual expenses incurred and professionals will normally not be allowed any amounts in addition to their out-of-pocket costs." The limitation is equally applicable to telecopier charges. Commercial rates are not a proper comparison because they represent a profit to the vendor. Profit is not a factor in capturing and reimbursing costs in a bankruptcy estate. "Actual costs ... are reimbursable ... but not in amounts which include any profit or mark up factor to the applicants." *In re Prairie Cent. Ry. Co.*, 87 B.R. 952, 960 (Bankr.N.D.Ill.1988). Professionals cannot make a profit by billing in excess of actual charges for expenses to the estate. *Ginji*, 117 B.R. at 995 (the court did not allow non-actual cost for facsimile machine charges to be used "as a profit-making center"). The mimicking of charges billed by other firms is not helpful because the charges do not represent the actual costs allowed to be reimbursed under section 330(a)(2). *See Pothoven*, 84 B.R. at 586; *S.T.N. Enters.*, 70 B.R. at 834–44. Outgoing telecopies should be charged at the cost of long distance telephone rates, and incoming telecopies charged at the actual costs of paper, toner, or ink, etc.

Telecopier charges are necessary if they were incurred because the service was reasonably needed to achieve the proper representation of the client. *See In re Wildman*, 72 B.R. 700, 731 (Bankr.N.D.Ill. 1987). The estates, however, should not have to bear this expense where attorneys, because of unwise planning, utilized facsimile machines to transmit papers that could have been sent through regular mail.

There may come a time in the near future when a local transmission from a facsimile machine will be considered as much an element of overhead as a local telephone call now is. Until that breakthrough, charges for telecopier use will be reimbursed, but only at the actual cost.

### ORDER

Accordingly, it is hereby

ORDERED, that Beaton is allowed interim fees in the amount of $1,451.43 and costs of $34.90, and it is further

ORDERED, that Deloitte is allowed interim fees in the amount of $36,190.00 and costs of $2,437.40 without prejudice to resubmit an amended application consistent with this opinion, and it is further

ORDERED, that Faught is allowed interim fees in the amount of $1,516.00 and costs of $629.46, and it is further

ORDERED, that LeBoeuf is allowed interim fees of $266,293.43 and costs of $29,-329.74. LeBoeuf may resubmit its cost

application with itemized telecopier charges consistent with this opinion, and, it is further

ORDERED, that Welborn is allowed interim fees in the amount of $113,221.05 and costs of $4,650.57, and it is further

ORDERED, that the prior orders allowing fees and costs for the second fee applications are hereby modified as set forth above, and, it is further

ORDERED, that the debtors are allowed to make interim distributions as indicated herein.